# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1037

_____

Binyam Bekele Baltti

*Petitioner*

v.

Jefferson B. Sessions, III, Attorney General of the United States

*Respondent*

_____

Petition for Review of an Order of the
Board of Immigration Appeals

_____

Submitted: May 9, 2017
Filed: July 10, 2017

_____

Before RILEY and BEAM, Circuit Judges, and ROSSITER,[1] District Judge.

_____

RILEY, Circuit Judge.

A former member of local government in his native Ethiopia, Binyam Bekele Baltti entered the United States in 2009 on a non-immigrant visitor visa after witnessing two government-sponsored massacres. Baltti now petitions for review of

_____

[1]The Honorable Robert F. Rossiter, Jr., United States District Judge for the District of Nebraska, sitting by designation.

the Board of Immigration Appeals's (BIA) denial of his application for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). We deny Baltti's petition.

## I.    BACKGROUND

In 2009, Baltti entered the United States on a non-immigrant visitor visa. Baltti is a member of the Mejenger tribe of Gambella, a western region of Ethiopia. Baltti's wife and two children currently reside in the capital city of Ethiopia, Addis Ababa. In 1995, Baltti joined the Gambella Regional Council, the governing body of his region, and was a tribal representative to the national House of Federation, which Baltti describes as "an elected body that represents each region in the federal Ethiopian government."

While Baltti attended a meeting of local leaders in Addis Ababa in 2002, Ethiopian government troops traveled to Gambella and murdered members of the Mejenger tribe and burned down Mejenger villages. According to Baltti, the massacre was retribution for the Mejenger tribe's opposition to the government's plan to force the migration of people currently residing in eastern Ethiopia into the Gambella region.

Baltti witnessed a second massacre in 2003. Ethiopian National Defense Force troops targeted educated members of another tribe, the Anuak tribe, in Gambella.[2] After the massacre, the Ethiopian government collected Gambellan leadership,

---

[2]Although not in the record, in 2005, BBC News reported "[a] three-day rampage . . . in December 2003 in which local Anuak people were killed, raped and mobs burned down more than 400 houses," but noted the discrepancy between the Human Rights Watch, which reported the Ethiopian "army carried out the human rights violations under the guise of combating Anuak bandits," and the Ethiopian government, which called the allegations "a 'blatant lie.'" *Ethiopia Army 'Killed and Raped,'* BBC News (Mar. 24, 2005), http://news.bbc.co.uk/2/hi/africa/4379119.stm.

including Baltti, and detained them in a military camp for three months. According to Baltti, the detainees were prohibited from communicating with anyone or leaving the encampment. At his release, the government instructed Baltti to give only the "official" story regarding the massacre, that the violence was inter-tribal, and the government took no part in the killings.

Baltti claims he disregarded the government's threats and began speaking in opposition to the massacres, but was not punished because his political position protected him from retaliation. In May 2008, Baltti joined a delegation of Gambellan officials on a brief trip to the United States with the then-president of the Gambella region, Omot Obang Olum. The purpose of the delegation was to meet with Gambellan expatriates who were currently living in the United States to promote the "official" government story of the 2003 massacre and to encourage the expatriates to return to Gambella.

At the delegation's first meeting in Minneapolis, Baltti had a chance to speak before the approximately 300 Gambellan expatriates in attendance and went off-script, stating the 2003 massacre was perpetrated by the Ethiopian military with help from local Gambellan forces.[3] Baltti feared being punished for his speech, and President Olum was "very angry" with him and prevented him from speaking at an additional delegation meeting. Immediately upon his return to Ethiopia, Baltti's

_____

[3]The Twin Cities Pioneer Press reported the Minneapolis meeting, stating President Olum attended a community meeting with 125 Anuak community members and "let another member of his government delegation speak while he jotted notes." *Ethiopians Confront Leader at Minneapolis Meeting About Massacre*, Pioneer Press (May 31, 2008), http://www.twincities.com/2008/05/31/ethiopians-confront-leader-at-minneapolis-meeting-about-massacre/. The article reported President Olum "blamed the killings on weak regional leadership in Gambella" and "appealed to the Anuak diaspora to return to Gambella." Id. The article did not mention Baltti by name or that any member of the delegation reported the Ethiopian government was behind the 2003 massacre.

government passport was confiscated. Baltti was fired from his position on the Gambella Regional Council and, while he retained his position with the House of Federation, that position was stripped of all its power. Baltti lost his income and was forced to pay a $1,700 fine, and he and his family were evicted from their home and placed under surveillance. Believing he was at risk of harm if he was not re-elected to his political position, which would result in a loss of his political immunity, Baltti planned to move to the United States.

Baltti was granted a non-immigrant visitor visa and traveled to the United States in April 2009. In October 2009, just before the visa's expiration, Baltti timely applied for asylum based on political opinion and for relief under the CAT, claiming both past persecution and a fear of future persecution. Baltti initially indicated he was also seeking asylum based on his social group but later amended his application to remove that ground. After the Department of Homeland Security charged Baltti with removability under 8 U.S.C. § 1227(a)(1)(B) as an alien who had overstayed his visa, Baltti conceded to removability as charged and resubmitted his application for asylum, withholding of removal, and CAT protection. See id. §§ 1158(b)(1)(A), 1231(b)(3)(A); 8 C.F.R. § 208.16(c).

The Immigration Judge (IJ) denied Baltti's application. Determining Baltti was a credible witness and his application was timely, the IJ found the actions taken against Baltti did not amount to persecution and Baltti did not have an objectively reasonable fear of future persecution on account of his political opinion. Baltti appealed to the BIA, renewing his social group claim and asserting he "clearly suffered past persecution based on his membership in a particular social group," because he "personally observed the massacre of the Anuak tribe in Gambella in 2003." The BIA agreed with the IJ's denial, determining Baltti's stated group was "not a cognizable particular social group for immigration proposes [sic] because it lacks the requisite social distinction," and Baltti did not show any past persecution was on account of a protected ground. The BIA reasoned Baltti failed to demonstrate

-4-

a well-founded fear of future persecution because it had been over a decade since the massacre had occurred and no similarly situated former elected officials were retaliated against for speaking out against the massacre. Baltti timely petitioned this court for review. See 8 U.S.C. § 1252.

## II. DISCUSSION
### A. Standard of Review

"We review the agency determination that an alien is not eligible for asylum, withholding of removal, or relief under the Convention Against Torture using the deferential substantial evidence standard." Osonowo v. Mukasey, 521 F.3d 922, 927 (8th Cir. 2008). The substantial-evidence standard is an "extremely deferential standard of review," Salkeld v. Gonzales, 420 F.3d 804, 809 (8th Cir. 2005), and requires "facts 'so compelling that no reasonable factfinder could fail to find the requisite'" determinations. Castillo-Gutierrez v. Lynch, 809 F.3d 449, 453 (8th Cir. 2016) (quoting Melecio-Saquil v. Ashcroft, 337 F.3d 983, 986 (8th Cir. 2003)). "Where, as here, the BIA issues an independent decision without adopting the IJ's conclusions, we review only the BIA decision." Constanza v. Holder, 647 F.3d 749, 753 (8th Cir. 2011).

### B. Past Persecution Based on Baltti's Social Group

To establish eligibility for asylum, an applicant must show he "is unwilling or unable to return to his home country 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" Vonhm v. Gonzales, 454 F.3d 825, 827 (8th Cir. 2006) (quoting 8 U.S.C. § 1101(a)(42)(A)). As an initial matter, we must determine whether we have jurisdiction to review Baltti's claim based on his membership in a particular social group. Baltti claimed persecution based on only his political opinion before the IJ, but in his brief to the BIA claimed he experienced both past persecution and a well-founded fear of future persecution based on his social group, defined as those who "personally observed the massacre of the Anuak tribe in Gambella in

-5-

2003." The government urges us to find Baltti's current description of his social group, "former elected officials who personally observed the government sponsored massacre of the Anuak and who spoke out against the government," is different than what Baltti argued before the BIA and thus not reviewable.

We have jurisdiction to review the BIA's final order of removal only if Baltti "has exhausted all administrative remedies available to [him] as of right." 8 U.S.C. § 1252(d)(1). We have interpreted this provision as evidence of Congress's intent "to require that an alien not only pursue all stages of administrative review, but also raise all issues before the agency." Frango v. Gonzales, 437 F.3d 726, 728 (8th Cir. 2006). When a petitioner attempts to "narrow his group," his argument for membership in that narrowed social group was "not clearly [raised] before the agency" and we lack jurisdiction to review it. Kanagu v. Holder, 781 F.3d 912, 917 (8th Cir. 2015). In his petition for review, Baltti attempts to narrow his social group from *all* witnesses of the 2003 massacre to just *former elected officials* who both witnessed the massacre and spoke out against the government. We do not have jurisdiction to review this newly defined social group. See id. ("Insofar as Kanagu attempts to further narrow his group on appeal, we lack jurisdiction to consider arguments not clearly made before the agency.").

Baltti does not ask us to review the BIA's finding that the group Baltti did raise before the BIA—"witnesses who 'personally observed the massacre of the Anuak tribe'"—is not a cognizable social group. Thus, we do not address the merits of this determination today. See id. ("As Kanagu does not appeal the agency's finding that 'individuals who are openly opposed to the Mungiki sect' is not a particular social group, he has failed to establish membership in a particular social group for the purposes of asylum.").

### C. Past Persecution Based on Baltti's Political Opinion

Baltti also contends the BIA erred in finding he did not experience past persecution on account of his political opinion. "Persecution is generally defined as 'the infliction or threat of death, torture, or injury to one's person or freedom'" and "is 'an extreme concept that excludes low-level intimidation and harassment.'" Barillas-Mendez v. Lynch, 790 F.3d 787, 789 (8th Cir. 2015) (first quoting Regalado-Garcia v. INS, 305 F.3d 784, 787 (8th Cir. 2002), then quoting Alavez-Hernandez v. Holder, 714 F.3d 1063, 1067 (8th Cir. 2013)). While persecution can include "a threat to an individual's life or freedom," Matter of Acosta, 19 I. & N. Dec. 211, 222 (BIA 1985), overruled in part on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439, 441 (BIA 1987), "[t]hreats alone 'constitute persecution in only a small category of cases, and only when the threats are so menacing as to cause significant actual suffering or harm,'" La v. Holder, 701 F.3d 566, 571 (8th Cir. 2012) (quoting Lim v. INS, 224 F.3d 929, 936 (9th Cir. 2000)).

The harms Baltti points to as evidence of past persecution, including his three-month detention in a military camp and the threats and retaliation he and his family received after his 2008 trip to the United States, do not compel the finding he experienced past persecution. See id. Baltti states he lost his income and his home in retaliation for his political comments, but Baltti never claims this threatened his life or freedom. See Beck v. Mukasey, 527 F.3d 737, 740-41 (8th Cir. 2008) (reasoning economic deprivation can amount to persecution if it is "'sufficiently harsh to constitute a threat to life or freedom'" (quoting Ahmed v. Ashcroft, 396 F.3d 1011, 1014 (8th Cir. 2005))). Though we note Baltti suffered hardship at the hands of the Ethiopian government in retaliation for his public comments about the 2003 massacre, the BIA did not abuse its discretion in determining Baltti did not suffer past persecution. Compare Cooke v. Mukasey, 538 F.3d 899, 904-05 (8th Cir. 2008) (finding past persecution where the alien "was taken into custody, threatened with death, and beaten with the butts of rifles until he lost consciousness" and repeated threats, beatings, and arrests were the direct result of the alien's involvement with a

-7-

particular political party), with Hassan v. Ashcroft, 388 F.3d 661, 667 (8th Cir. 2004) (reasoning an applicant for asylum was not subjected to past persecution where he was "taken from his home in the midst of a civil war" and "interned because the insurrectionists wanted to ensure no able-bodied men could fight back").

### D.    Well-Founded Fear of Future Persecution

"Because [Baltti] has not established past persecution, establishing a well-founded fear of future persecution requires showing that [his] fear is both subjectively genuine and objectively reasonable." La, 701 F.3d at 572. "For an alien's fear of persecution to be objectively reasonable, the fear must have basis in reality and must be neither irrational nor so speculative or general as to lack credibility." Perinpanathan v. INS, 310 F.3d 594, 598 (8th Cir. 2002). Neither party contests the BIA's finding that Baltti "may genuinely fear harm in Ethiopia," and we agree with the BIA this genuine fear is not objectively reasonable.

Baltti claims his fear of future persecution is based on his political opinion, which led him to speak out, in 2008, against a massacre that occurred in 2003. Baltti does not show "why these rather dated events provide an objectively reasonable basis for a present fear of 'particularized persecution directed at h[im].'" Hamzehi v. INS, 64 F.3d 1240, 1243 (8th Cir. 1995) (quoting Safaie v. INS, 25 F.3d 636, 640 (8th Cir. 1994)). Baltti was able to live, unharmed, in Ethiopia for ten months after his 2008 comments and does not point to any individuals with similar political opinions who were persecuted after speaking about the 2003 massacre. While Baltti's fear of persecution may be genuine, Baltti does not point to any specific facts indicating this fear is more than speculation of the possibility of future harm. "[A]fter reviewing the record, we cannot say that 'no reasonable factfinder could fail to find the requisite fear of persecution.'" Wanyama v. Holder, 698 F.3d 1032, 1036 (8th Cir. 2012) (quoting Osuji v. Holder, 657 F.3d 719, 720 (8th Cir. 2011)); see also Castillo-Gutierrez, 809 F.3d at 453 (finding no objective fear of future persecution where the

-8-

applicant speculated he would be retaliated against for public accusations against the Nicaraguan police).

### E. Withholding of Removal and Relief Under CAT

"Because [Baltti] failed to meet his burden of proof for asylum, he necessarily fails to meet the higher burden of proof required for withholding of removal," namely demonstrating a clear probability he will be persecuted on account of his membership in a particular social group or his political opinion. Ngugi v. Lynch, 826 F.3d 1132, 1139 (8th Cir. 2016); see also Juarez Chilel v. Holder, 779 F.3d 850, 854 (8th Cir. 2015) ("To qualify for withholding of removal, [an applicant] must show that he has experienced past persecution on account of one of those characteristics or that, based on that characteristic, there is 'a clear probability that his . . . life or freedom would be threatened in the proposed country' if he were forced to return." (omission in original) (quoting Mouawad v. Gonzales, 485 F.3d 405, 411 (8th Cir. 2007))).

Separate analysis under the CAT "is required only when there is evidence the alien may be tortured for reasons unrelated to his claims for asylum and withholding of removal," Guled v. Mukasey, 515 F.3d 872, 882 (8th Cir. 2008), and Baltti does not assert he is likely to be tortured for any reasons unrelated to his other claims. We do not independently analyze Baltti's claim for relief under the CAT today.

## III. CONCLUSION

Because the facts do not compel a finding of past persecution or a well-founded fear of future persecution, we deny Baltti's petition for review.

_____